UNITED STATES BANKRUPTCY COURT
FOR EASTERN DISTRICT OF KENTUCKY
AT LEXINGTON

*ELECTRONICALLY FILED*

| | |
|---|---|
| In re: | Case No. 20-51079 |
| Tew Limited Partnership | Chapter 11 |
| Debtor. | |

### SKATTEFORVALTNINGEN'S OBJECTION TO THE DEBTOR'S PLAN OF REORGANIZATION

Skatteforvaltningen ("SKAT"), which is the Customs and Tax Administration of the Kingdom of Denmark and a creditor of the above-captioned debtors, objects to the Subchapter V Small Business Plan of Reorganization ("Plan") filed by Tew Limited Partnership ("Debtor" or "Partnership"). In support of this objection, SKAT states as follows:

**I.     PRELIMINARY STATEMENT**

1.     The Plan cannot be confirmed as currently proposed. First, the Plan is not feasible. The Debtor's projections as to financing, income and expenses—and thus the net proceeds available to satisfy the claims of creditors—are overstated in certain places, understated in others, and overall too speculative and without any basis. This is particularly the case given that the Plan hinges on the success of Bernard Tew's chapter 11 plan of reorganization, which has not yet been proposed—let alone provided for the requisite financing, been established as feasible, or been confirmed. Second, the Plan has not been proposed in good faith as it fails to disclose a major funding impediment. The Plan's funding relies on Mr. Tew's purported ability to earn a living as an investment advisor to pension plans. He has cited the SKAT Litigation, as described below, as a roadblock to this business, which would be eliminated through confirmation of plans in his personal chapter 11 proceeding and this proceeding. However, the true roadblock to Mr. Tew's earnings to fund this Plan, and any proposed in his personal bankruptcy, is that his settlement with the Kentucky Department of Labor bars Mr. Tew from advising ERISA-covered

pension plans.  Third, the Plan cannot be confirmed nonconsensually because the Plan does not demonstrate a reasonable likelihood of making Plan payments or provide for appropriate remedies should it fail to do so.  Finally, the Plan's injunction is overbroad.  For these reasons and for those set forth in the other objections to the Plan filed with the Court, the Court should deny Plan confirmation.

## II.   JURISDICTION

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory basis for the relief requested herein is 11 U.S.C. §§ 105, 1123, 1126, 1128 and 1129 and Federal Rules of Bankruptcy Procedure 3018 and 3020.

## III.  BACKGROUND

### A.   Chapter 11 Procedural History.

3. On July 23, 2020, the Debtor filed a petition for relief under Subchapter V of Chapter 11 of the United States Code ("Bankruptcy Code") in the United States Court for the Eastern District of Kentucky, Lexington Division.  The same day, Bernard and Andrea Tew ("Tews") filed for relief under the same subchapter of the Bankruptcy Code.  *See In Re Bernard and Andrea Tew*, 20-51078-tnw (Bankr. E.D. Ky. July 23, 2020), ECF No. 1.  On August 11, 2020, an order was entered authorizing joint administration of these two cases under Case No. 20-51078. *Id*. ECF No. 35.

4. On September 11, 2020, the United States Trustee filed an opposition to Bernard and Andrea Tew proceeding under Subchapter V.  *Id*.  ECF No. 52.  SKAT joined this opposition.  *Id*.  ECF No. 69.  On September 25, SKAT filed an objection to the Debtors' Motion to Define Scope and Authorize Use of Cash Collateral.  *Id*.  ECF No. 71.  In it, SKAT noticed its claims to the Debtor and all parties in interest.

5. On September 30, 2020 the Court struck the Tews' Subchapter V designation.  *Id.* ECF No. 83.  On October 7, 2020, the Tews filed an Amended Petition indicating their intent to proceed under Chapter 11 of the Bankruptcy Code without a small business designation.  *Id*.  ECF No. 87.  On October 15, 2020 the Court vacated the order authorizing joint administration of the Tews' case and the Debtor's

2

case. *Id*. ECF No. 97. On October 21, 2020, the Partnership filed the Plan. ECF No. 46. SKAT has filed a formal proof of claim and voted to reject the Plan. SKAT holds an unsecured contingent claim and is properly treated as a Class 7 claimant under the Plan.

**B.    SKAT's Claims.**

6.    Tew, LP Retirement Plan, a plan purportedly sponsored by the Debtor, is a defendant in an action brought by SKAT, alleging, inter alia, fraud, negligent misrepresentation, and unjust enrichment. Another action brought by SKAT names as a defendant SV Holdings, LLC Retirement Plan, a pension plan purportedly sponsored by Tew Limited Partnership's general partner. Bernard and Andrea Tew, also the Debtor's partners, are defendants in 13 additional cases brought by SKAT. These fifteen actions were originally filed in the United States District Court for the Eastern District of Kentucky, and later consolidated with over one hundred other actions into a federal multidistrict litigation styled *In re Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation*, Case No. 18-md-2865 ("MDL"). The MDL is currently pending in the United States District Court for the Southern District of New York and assigned to the Honorable Lewis A. Kaplan.

7.    SKAT's civil cases in the MDL stem from a scheme to deceive SKAT into paying out over 12.7 billion Danish Kroner ("DKK"), or approximately $2.1 billion (US), of allegedly withheld dividend tax. Each of over 300 claimants ("Claimants"), which were primarily U.S. pension plans, purported to own shares in Danish companies listed on the OMX Copenhagen 20 Index, the 20 most-traded stocks in Denmark.

8.    The Claimants, acting through their agents and representatives, applied to SKAT claiming repayments of amounts withheld on dividends they purported to have earned on shares of Danish companies they claimed to hold. In its complaints in the MDL, SKAT alleges these applications were false because the Claimants did not own the shares they claimed to own, did not earn the dividends they claimed to have earned, and/or were not entitled to the refund amounts they claimed from and were paid by SKAT. Claimants that were based in the United States, along with certain of their authorized representatives, are the defendants in the MDL. SKAT asserts that it paid to the defendants in the MDL

3

baseless withholding tax refund claims of approximately $2.1 billion (US) and demands recovery of that amount in civil court.

9.     SKAT's complaints allege $2,425,000 in damages against the Tew, LP Retirement Plan and its codefendant in one case, $33,997,000 in damages against Bernard Tew and his codefendants in 12 cases, $2,389,000 against Andrea Tew and her codefendant in one case, and $2,243,000 in damages against the SV Holdings LLC Retirement Plan and its codefendants.

## IV.     OBJECTIONS TO PLAN OF REORGANIZATION

10.    The Debtor, as Plan proponent, must establish that the Plan satisfies the applicable requirements of section 1129 of the Bankruptcy Code by a preponderance of the evidence. *See, e.g., In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 458-60 (Bankr. S.D. Ohio 2011); *see also* 11 U.S.C. § 1191 (providing the requirements of section 1129 that are applicable in a subchapter V chapter 11). It has not done so.

### A.     **The Plan is Not Feasible.**

11.    To be confirmed, a plan of reorganization must be feasible. Section 1129(a)(11) of the Bankruptcy Code establishes the requirement. It provides:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12.    Factors utilized to determine a plan's feasibility include: (1) the adequacy of the capital structure, (2) the earning power of the business, (3) economic conditions, (4) the ability of management, (5) the probability of the continuation of the same management, and (6) any other related matter which determines the prospects of a sufficiently successful performance of the plan (collectively, the "*Teamsters* Factors"). *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc.*, 800 F.2d 581, 589 (6th Cir.1986). Essentially, § 1129(a)(11) requires courts to scrutinize carefully a plan to determine whether it offers a reasonable prospect of success. *In re Montgomery Court Apts.*, 141 B.R. 324, 331 (Bankr. S.D. Ohio 1992).

4

13. Application of the *Teamsters* Factors to the case at hand demonstrates that the Plan is not feasible and should not be confirmed. As to the first two factors, neither the Debtor's capital structure nor its earning power is adequate. Throughout the Plan, the Debtor's only source of revenue is income from its sale of foals. The Debtor's own projections indicate a shortfall in 2021 of $35,500, in 2022 of $20,900, and in 2023 of $41,900, before any cash is available to satisfy Plan payments. The Debtor expects to remedy that shortfall through "partnership contributions" in the amount of $650,000. However, the Debtor cannot provide adequate assurances that Bernard Tew will be able to provide such contributions. In fact, as to the fourth factor, based on current and past performance, it is more likely Mr. Tew will not be able to do so and the Debtor's revenues will not be able to support its Plan obligations. Moreover, Mr. Tew is himself a debtor in chapter 11 proceedings and cannot commit to providing financing until his own chapter 11 plan is proposed and confirmed by this Court. The Plan provides no alternatives should these contingencies not occur.

      **a.**      **The Plan Relies on Speculative Financing.**

14. The first *Teamsters* factor requires the Court to scrutinize the Plan's capital structure. Here, the Plan relies on significant financing from its majority limited partner, Mr. Tew. *See* Plan § 5.1. As noted above, Mr. Tew is himself a debtor in chapter 11 proceedings and has indicated that his plan of reorganization, which will ostensibly provide the necessary financing, involves restarting his pension plan advising business. *See* Smith Declar., Ex. 1, 341 Tr. at 35:5, 36:15-20. Such financing is entirely speculative and, thus, the Plan cannot meet the feasibility requirement.

15. Where a plan relies on financing, the proponent must provide an adequate showing that such financing will likely occur. *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D. 1985) (finding that debtor's plan failed the feasibility test because it didn't contain sufficiently concrete assurance that the loan will close or that property will be appraised at a high enough value to provide the loan); *see also In re Archdiocese of Saint Paul & Minneapolis*, 579 B.R. 188, 203 (Bankr. D. Minn. 2017) (plan infeasible on its face where plan requires funding and debtors had not made a showing that the financing would likely occur); *cf. In re Aurora Memory Care, LLC*, 589 B.R. 631 (Bankr. N.D. Ill. 2018) (when a

5

proposed Chapter 11 plan depends on post-petition financing, it is not possible to satisfy the feasibility requirement for confirmation without evidence of a firm commitment of financing); *In re Aspen Village at Lost Mountain Assisted Living, LLC*, 609 B.R. 555 (Bankr. N.D. Ga. 2019) (same); *In re Nesbit,* Bap No. EP 07–068, 2008 WL 8664762, at *5 (1st Cir. BAP June 17, 2008) (noting in a Chapter 13 case that many courts have held that "unsubstantiated expectations of financial contributions from third parties are insufficient to meet the feasibility requirement").

16. The Plan provides in relevant part:

Means of Implementation and Funding the Plan: No later than February 1, 2021, the Reorganized Debtor will require its majority limited partner, Bernard V. Tew, to contribute sufficient funds to make all payments contemplated by the Plan towards Allowed Administrative, Priority and Secured Claims, and to fund the operating expenses of the Reorganized Debtor's thoroughbred horse operations. The majority limited partner shall continue to contribute sufficient funds to the Reorganized Debtor to make all Plan payments during the life of the Plan[.]

Plan § 5.1.

17. In *In re Trenton Ridge Inv'rs, LLC*, the plan relied on contributions from a member of the LLC to fund the plan. The court held that "[i]n order to establish feasibility, Trenton Ridge must provide evidence that the Member Noteholders would have the ability to provide the necessary infusion of cash." 461 B.R. at 490–91; *see also In re Wiston XXIV, Ltd. P'ship*, 153 B.R. 322, 327 (Bankr. D. Kan. 1993) ("As filed, the debtor's plan does not demonstrate that its income will be sufficient to pay its expenses plus the payments due under the plan. The general partner's promise to pay $100,000 cash to the debtor in the next two years is not supported by proof he has any tangible means of satisfying that promise. Without his contribution, the plan shows a negative cash flow, even assuming everything else goes as the debtor has projected.") "Based on the lack of proof that it will be able to raise the several hundred thousand dollars in cash needed" the court found Trenton Ridge had "not established the feasibility of its plan of reorganization by a preponderance of the evidence." *In re Trenton Ridge Inv'rs, LLC*, 461 B.R. at 490–91.

18. The reasoning in *Trenton Ridge* applies even more forcefully here, where funding from partner contributions depends entirely on the successful reorganization of the Debtor's majority limited

6

partner, Mr. Tew. In order for a Plan which relies on a projected $650,000 in funding from a partner who is himself currently in chapter 11 to be feasible, the Debtor must first establish that Mr. Tew will emerge from chapter 11, establish that his confirmed plan of reorganization will allow for such contributions, and, finally, establish he will be able to contribute such funding to the Debtor.

19. There is no evidence to support these conditions precedent. As detailed below, the projection that Mr. Tew will be able to contribute $650,000 to the Partnership over the next three years, is not supported by his past and present performance. Moreover, as noted above, Bernard Tew has not yet proposed a plan of reorganization. Before the Partnership's Plan may rely on financing from him, Mr. Tew's plan must first be proposed, second, provide for such financing and finally, be confirmed by this Court.

20. The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises creditors more under a proposed plan than the debtor can possibly attain after confirmation. *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985). The Plan's reliance on its bankrupt partner to fund the Plan is a visionary promise to creditors and it is purely speculative whether the Debtor can attain such promise. The Plan's provision relying on partner contributions makes the plan not feasible. 11 U.S.C. § 1129(a)(11).

   **b.  The Plan's Projections are Unrealistic.**

21. Another critical issue in assessing the feasibility of a plan that provides for the debtor's continued operation, and speaks to the second and fourth *Teamsters* factors, is whether the debtor can generate "sufficient cash flow to fund and maintain both its operations and obligations under the plan." *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 482 (Bankr. E.D. Mich. 1995) (citation omitted). Subchapter V plans of reorganization are required by Section 1190(1)(C) to contain "projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization." 11 U.S.C. § 1190(1)(C). For the Plan to be feasible its "income projections must be based on concrete evidence of financial progress and must not be speculative, conjectural or unrealistic." *In re Trevarrow Lanes, Inc.*, 183 B.R. at 482. In examining financial projections presented to support a plan, the court must find the

7

projections are realistic and reasonable assumptions which are capable of being met. *In re Ridgewood Apts. of DeKalb County, Ltd.*, 183 B.R. 784, 789 (Bankr. S.D. Ohio 1995).

22. Here, the Plan and projected ability to make payments proposed under the Plan rely on both its own projected income and the projected income of another chapter 11 debtor, Mr. Tew. *See* Plan, Ex. D, Tew LP Financial Projections; *see also* Plan § 5.1.

                *i.*     *Past Performances do not Support Plan Projections.*

23. A discrepancy between facts surrounding a chapter 11 debtor's past performance and activity and debtor's predictions for future is strong evidence that debtor's projections are flawed, and that debtor's proposed plan is not "feasible," as required for confirmation. *In re Investment Company of The Southwest, Inc.*, 341 B.R. 298 (B.A.P. 10th Cir. 2006); *see also In re Trevarrow Lanes, Inc.*, 183 B.R. at 482; *In re Slabbed New Media, LLC*, 557 B.R. 911 (Bankr. S.D. Miss. 2016) (proposed chapter 11 plan filed by bankrupt LLC which had earned basically no income for the past few years, and whose plan depended on uncertain results of litigation, and a promised $10,000 cash infusion from its principal, was not feasible and could not be confirmed).

24. The record evidence regarding the Debtor's past performance consists of only the Debtor's 2018 tax return[1] and Exhibit B, the Debtor's Brief History of Operations.

25. The Debtor's History of Operations indicates that the "Woodford County Property" that is subject to the Plan, is the second property that the Partnership has owned. The Partnership previously owned the "Lyon County" property, which "was sold to avoid foreclosure." Moreover, the History of Operations reveals that "[t]hroughout the existence of the partnership, the majority owner has contributed substantial funds to keep the partnership viable." Accordingly, the History of Operations establishes that the Partnership has a history of inability to make debt service payments and that, without regular cash

---

1. In response to the Court's July 23rd order to meet its obligation to provide its most recent balance sheet, most recent statement of operations, most recent cash-flow statement, and most recent Federal income tax return, the Debtors provided their 2018 tax return and, Bernard Tew stated under penalty of perjury that the Debtor does not have any recently prepared statement of operations, balance sheets, or cash-flow statements. *See* ECF No. 12.

8

infusions from Mr. Tew, it has never made enough revenues to support its operations. This is significant because, as detailed above, Mr. Tew's ability to make such cash infusions cannot be established before his own chapter 11 plan is confirmed. Consequently, contrary to the projections, the History of Operations makes plain that the Debtor will not be able to meet its Plan obligations.

26. The Debtor's 2018 tax return shows a net farm loss of $144,082 and an ordinary business loss of $90,558. *See* ECF No. 12 at 2. Excluding partnership contributions, projected losses under the Plan would be between $20,900 and $41,900 each year. This discrepancy between past losses and expected losses arises from an unrealistic projection of revenues and expenses.

27. The Debtor projects it will generate revenue of $150,000 in 2022 and 2023, all from the sale of foals. The 2018 tax return is the only record evidence speaking to the Debtor's ability to earn such revenues. *See In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985) (bankruptcy court properly relied on the absence of certain managerial and income data from debtors' plan in declining to confirm the plan). It provides that in 2018 the Debtor made only $68,524 from selling horses, less than half of the revenue it projects in the Plan. Accordingly, the Debtor's past performance does not support its projections as to expected revenue.

28. With respect to expenses, the Debtor's projections are understated in a number of significant areas—to a degree that may make it impossible for the Debtor to meet its obligations in year 1 of the Plan. For example, the Debtor projects it will pay $0 in Utilities for the duration of the Plan, while it paid $5,551 in Utilities in 2018. The Debtor further anticipates property tax expenses of $400 in 2022 and 2023, when it claimed $3,166 in tax expenses in 2018. The Plan does not set forth the basis for any alteration in tax treatment that would provide for such a savings.

29. These underestimations are critical to the Plan. Every under-projected dollar makes the Plan more speculative, infeasible, unfair, and inequitable. When the Debtor's understatement of tax and other expenses are recognized, the Debtor becomes more likely to lose money in each year of the Plan, even assuming the unlikely possibility that Mr. Tew's is able to confirm a plan of reorganization which

9

will allow for him to pay the Partnership $650,000, and that he will actually be able to make such payments.

30. In fact, Mr. Tew's past performance indicates that he will be unable to finance the Plan, as provided for in Plan section 5.1. In their chapter 11 case, Mr. and Mrs. Tew have filed only their 2019 tax return as evidence of the past performance of the business. *See In Re Bernard and Andrea Tew*, No. 20-51078-tnw (Bankr. E.D. Ky Aug, 20, 2020), ECF No. 40.[2] According to the return, Mr. Tew's gross income was $0 in 2019 and *negative* $720,000 in 2018. *See id*. at 46. The 2018 loss arises from operating a business. *Id.* Presumably, this large loss is from his pension plan advising business. Accordingly, the record evidence does not support a projection that, based on past performance, Mr. Tew will be able to contribute $650,000 to fund the Plan.

          ii.        *Present Performances do not Support Plan Projections.*

31. In addition to assessing past performance, to determine whether projections offered to show feasibility of a proposed chapter 11 plan are reasonable, a court will analyze debtor's projected income and expenses in relation to its present performance*. In re Trenton Ridge Investors, LLC*, 461 B.R. at 440. In assessing "feasibility" of a proposed chapter 11 plan, a court should determine whether debtor is on a path to recovery by doing better during the case than it was prior to filing bankruptcy petition; if the debtor remains stagnant but projects a substantial improvement in its numbers, then debtor needs to convince court in a substantive, detailed way why the future will be different. *In re Geijsel*, 480 B.R. 238 (Bankr. N.D. Tex. 2012).

32. Since filing, the Debtor has filed two monthly operating reports. *See* ECF Nos. 40, 49. In both reports, the current monthly income has been $0.00. *Id.* Accordingly, the Debtor's present performance does not support a plan of rehabilitation in any respect.

33. Mr. Tew's inability to make any investment adviser income during the pendency of his case also indicates that he is unlikely to be able to make the required capital contributions. At the 341

---

2. As with the Partnership, Mr. Tew stated under penalty of perjury that he did not have any recently prepared statement of operations, balance sheets, or cash-flow statements.

10

hearing, Mr. Tew represented that he expected to start generating revenue through his plan to act as an adviser to retirement plans by "the end of September, mid-October". *See* 341 Tr. 37:7-8. The Mr. and Mrs. Tew have filed operating reports for August and September. *See In Re Bernard and Andrea Tew*, No. 20-51078-tnw (Bankr. E.D. Ky), ECF Nos. 66, 110. They have not filed an operating report for October to date. They did, however, file a statement of current income on October 28, 2020. *Id.* ECF No. 117.

34. Despite Mr. Tew's representations that he would earn investment adviser income in September or October, the September operating report shows income only from Mrs. Tew's salary, social security income, and "Dutch Legal reimbursements", and the October 28th statement of current income provides that Mr. Tew is still earning $0 a month. *See id.* ECF No. 110 at 8. Accordingly, the record evidence of Mr. Tew's present performance indicates that he will not be able to fund the Plan.

35. Given Debtor's prior and present track record, and evidence that the Debtor will not be able to obtain the cash infusion it will need in each of the three Plan years, the Plan is not feasible and should not be confirmed.

### B. The Plan is Not Proposed in Good Faith.

36. Chapter 11 plans must be proposed in good faith, and lack of good faith is cause for dismissal. 11 U.S.C § 1129(a)(3). Good faith under § 1129(a)(3) is "generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Waterford Hotel, Inc.*, 497 B.R. 255, 266 (Bankr. E.D. Mich. 2013) (quoting *In re Trenton Ridge Investors, LLC*, 461 B.R. at 468); *see also In re Dow Corning*, 244 B.R. 673, 675 (Bankr.E.D.Mich.1999). Good faith generally requires that the plan be proposed "with honesty and good intentions, and with a basis for expecting that a reorganization can be effected," and that the plan proponent deal with its creditors "in a manner that is fundamentally fair." *In re Gregory Boat Co.*, 144 B.R. 361, 366 (Bankr.E.D.Mich.1992). When considering a plan, courts consider the "totality of the circumstances," and the court's own "common sense and judgment." *In re Okoreeh–Baah*, 836 F.2d 1030, 1033 (6th Cir.1988).

37. Here, as discussed above, the Plan is completely infeasible. There is no basis for expecting that a reorganization can be effected, given the evidence before the Court. The Plan completely relies on funding that is entirely speculative and highly unlikely to come to fruition. Indeed, as noted below, Mr. Tew is barred by a settlement with the Department of Labor from acting as a fiduciary or service provider to any employee benefit plan or account. Accordingly, he cannot reasonably expect to earn the income necessary to fund the Plan and there is absolutely no basis for expecting that the reorganization can be effected.

38. Additionally, the totality of the circumstances indicate that the Debtor proposed the Plan to enjoin the SKAT litigation. Indeed, the Debtor shows its hand in the History of Operations when it says that "[t]he SKAT lawsuits in 2018 derailed this plan [to have Bernard Tew contribute enough money from employment earnings and retirement fund earnings to support and extinguish the partnership's debt], as the primary limited partner's ability to earn wages was affectively [sic] prohibited". *See* Plan, Ex. B.

39. In both this case and Mr. Tew's case, the Debtor and Mr. Tew have repeatedly alleged that SKAT's litigation led to his demise as an investment advisor to pension plans, suggesting that a successful reorganization will require enjoining SKAT's litigations against and affecting him.

40. The Debtor in this proceeding and debtors Mr. and Mrs. Tew have failed to inform the Court that, in 2012 and 2013, the Department of Labor brought three cases against Mr. Tew and his associates, arising out of his service to pension plans. *See Solis v. Hofmeister et al.*, No. 5:12-cv-00250 (E.D. Ky. Aug. 9, 2012); *Harris v. La Courciere et al.*, No. 5:13-cv-00158 (E.D. Ky. May 30, 2013); *Harris v. Hofmeister et al.*, No. 5:13-cv-00156 (May 30, 2013). And, since 2015, as part of the settlement of those cases, Mr. Tew has been barred from acting as a fiduciary or service provider to any employee benefit plan or account. *See* Smith Declar., Ex. 2, Settlement Agreement. Accordingly, it is not SKAT's litigation that *effectively* prohibits Mr. Tew from earning income by acting as an adviser to

pension plans, but a settlement with the Kentucky Department of Labor that *actually* prohibits Mr. Tew from doing so.[3]

41. SKAT's litigations have done nothing to prohibit Mr. Tew from continuing to earn employment income as an investment adviser. Indeed, at the 341 meeting, Mr. Tew admitted that there is no restriction arising from the SKAT litigation that legally bars him from managing funds for others. *See* 341 Tr. at 36:2-7.

42. Because there is no basis for expecting that the Plan can be effected and the totality of the circumstances suggest bad faith, the Court should find that the Plan was not filed in good faith and decline to confirm it. *See, e.g., In re Silberkraus*, 253 B.R. 890, 905–06 (Bankr. C.D. Cal. 2000), *aff'd*, 336 F.3d 864 (9th Cir. 2003) ("two party disputes in . . . federal district court . . . should be resolved through the normal litigation process in those forums, and . . . it is bad faith to file bankruptcy instead of continuing with the normal litigation process in the nonbankruptcy forums") (collecting cases).

    C.    **The Plan Cannot Be Confirmed Nonconsensually Under Subchapter V.**

43. Bankruptcy Code section 1191 provides the conditions for confirmation of a Subchapter V plan of reorganization. It incorporates and alters various provisions of Bankruptcy Code section 1129, which provides the conditions for confirmation of an ordinary chapter 11 plan of reorganization. Pursuant to section 1191(b), if all of the applicable requirements of section 1129(a), other than paragraphs (8), (10), and (15), are met with respect to a plan, the Court, on request of the Debtor, shall confirm the plan notwithstanding the requirements of such paragraphs, if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. 11 U.S.C. § 1191(b).

---

3. The settlement does not reach retirement plans or accounts that are not subject to ERISA, such as "a retirement plan or account for which Bernard V. Tew and/or a relative . . . are the exclusive participants." *See* Settlement Agreement ¶ 2. However, at the 341 Hearing, Bernard Tew represented that his plan of reorganization would entail trading with the retirement plan of an "old, old friend". *See* 341 Tr. 35:1, 5. Mr. Tew also represented that because "It's a consulting-type arrangement," he's "allowed to" provide investment advice to retirement plans. *See* 341 Tr. at 36:20-21. This contention is not supported by the statutory definition of "fiduciary", *see* 29 U.S.C. § 1002(21), the regulations promulgated thereunder, *see* 29 CFR § 2510.3-21, nor the case law, *see e.g., Briscoe v. Fine*, 444 F.3d 478, 494 (6th Cir. 2006); *Ellis v. Rycenga Homes, Inc.*, 484 F.Supp.2d 694, 708–09 (W.D. Mich. 2007).

13

44. The Debtor submits that with respect to any nonaccepting class that the Plan does not discriminate unfairly and is fair and equitable and requests confirmation pursuant to 11 U.S.C. § 1191(b) with respect to any such classes. *See* Plan § 10.5. SKAT disagrees. The Plan does meet the fair and equitable requirement for a non-consensual subchapter V plan.

### a. The Plan is Not Fair and Equitable.

45. Section 1191(c) establishes the requirements for a non-consensual plan to be "fair and equitable". 11 U.S.C. § 1191(c). Relevant here, the plan is fair and equitable if (i) it proposes to commit all of the debtor's disposable income for the entire term of the plan to making plan payments; (ii) the debtor is able to make the payments under the plan or there is a reasonable likelihood that the debtor will be able to make the payments; and (iii) the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect creditors if the payments are not made. *See In re Pearl Res. LLC*, No. 20-31585, 2020 WL 5823303, at *21 (Bankr. S.D. Tex. Sept. 30, 2020). The Plan does not meet these requirements.

46. For a business entity subchapter V debtor, section 1191(d) defines "disposable income" as the debtor's income that is not reasonably necessary "for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor." 11 U.S.C. § 1191(d); *see also In re Body Transit, Inc.*, 619 B.R. 816, 822 n.7 (Bankr. E.D. Pa. 2020). Section 1191(c)(3)(A) requires that the debtor be able to make all payments under the plan, or that there is a reasonable likelihood that the debtor will be able to make all payments under the plan. 11 U.S.C. § 1191(c)(3)(A)(i-ii). "The new requirement fortifies the . . . feasibility test that § 1129(a)(11) contains." *In re Pearl Res. LLC*, No. 20-31585, 2020 WL 5823303, at *22.[4]

47. Here, the Debtor proposes to pay each Class 7 allowed unsecured claim its pro rata share of 100% of the reorganized Debtor's "Net Profits". Net Profits is defined as "cash remaining after

---

4. SKAT incorporates by reference the arguments regarding feasibility here, and submits that, to the extent that the Court finds that the Plan is feasible, which it should not under the applicable case law, it should not find that it is reasonably likely that the Plan will be successful.

payment of all ongoing company obligations, including costs of goods, payroll, operating expenses, debt service and leases, capital expenditures,[] taxes[,] the maintenance of an operating reserve [and] payouts to Allowed Secured Claims, and any Allowed Administrative and/or Allowed Priority Claims." Plan § 4.7. Although "Creditors will receive distributions based on actual Net Profits and not projections so distributions may be higher or lower than projected" the Plan claims that "projected yearly Net Profits are set forth in Exhibit D[.]" *Id*. However, Exhibit D fails to project Net Profits; it only projects amounts "Available for Debt Service".

48. To illustrate the difference, assuming the plan is confirmed this year and Mr. Tew is able to contribute $150,000 and the unrealistic projected expenses are accurate, in 2021, there will be $114,500 available for debt service. To satisfy their Class 1 obligations, the Debtors will have to make nine payments of $4,986.43, and a payment of $43,663.40 plus additional accrued interest and legal fees not to exceed $5,000. This amounts to anywhere between $88,541.27 and $93,541.27. This leaves between $20,958.73 and $25,958.73. The Debtor must then pay 2020 ad valorem taxes, Allowed Administrative Claims and Allowed Priority Claims. Although the Plan provides no projections as to the amounts of such claims, they may be over $21,000. If they are, the Debtor will not likely be able to make payments required under the Plan. Thus, even if one accepts the Debtor's generous projections and infeasible financing, it may not be able to satisfy its obligation to make payments under the Plan. Moreover, even assuming Mr. Tew can make the projected contributions, he is not "required to contribute funds to be used as Net Profits". *See* Plan § 5.1. Accordingly, because the Plan projects a short fall in each year before the contributions, in reality, there are no projected Net Profits, and Class 7 claims, and those claims treated as Class 7 claims, will almost certainly receive nil.

49. Section 1191(c)(3)(B) requires a nonconsensual plan to provide appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made. 11 U.S.C. § 1191(c)(3)(B).

50. In *In re Pearl Res. LLC*, the plan provided for the distribution of debtors' disposable income to holders of allowed claims, including the objecting creditors, if and when an objecting creditor

15

was determined to hold an allowed claim. No. 20-31585, 2020 WL 5823303, at *22. The court found that a plan provided for an appropriate remedy where the plan provided for the liquidation of collateral, and the collateral's value was significantly greater than the absolute highest amount allowed claims could total in the aggregate. *Id*. at *23. Thus, if the claims were not paid in full through the distribution of disposable income within two years, it was likely that debtors would be in a position to generate sufficient funds from the sale of their assets to pay the allowed claims in full. *Id*.

51. If the scenario detailed above comes to fruition under the Plan, and Net Profits are $0, not only will the Debtor make no payments on Class 3, 4, and 7 allowed claims, but the Debtor will be unable to make payments on the Class 1 allowed claim. Creditors will get nothing and yet their claims will be still be discharged under the Plan. *See* Plan § 4.10.1. The Plan may not give Debtor "carte blanche" regarding its performance under the Plan. It does not provide for the liquidation of certain assets, as provided for in section 1191(c)(3)(B) and *In re Pearl Res. LLC*. There is no consequence if the Debtor does not meet its projections; there is no specified default if payment is not made; no default interest rate; no provision for late charges; no security interest in personal property; no assignment of rents; no requirement that insurance be maintained; no prohibition against waste; no requirement that taxes and insurance payments be escrowed; and no formula for determining how much cash the Debtors may keep in the operating reserve before making Net Profit payments.

52. Because the Plan does not provide for appropriate remedies, it is not fair and equitable, and may not be confirmed nonconsensually.

    **D.**    **The Plan Contains an Overbroad Injunction.**

53. The proposed injunction (the "Injunction") contained in Plan § 4.10.2 constitutes an overbroad non-debtor release that violates Bankruptcy Code § 524(e) and applicable Sixth Circuit law.

54. Bankruptcy Code § 1129(a)(1) prohibits confirmation of a Chapter 11 plan that does not comply with all applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). A plan injunction cannot release non-debtors unless "unusual circumstances" are present. A debtor must show that the release provision is, on its face, permissible as to any possible claim that could be affected in light

16

of the circumstances, the debtor's plan of reorganization, and the foreseeable claims of the debtor's creditors. *In re Firstenergy Sols. Corp.*, 606 B.R. 720, 733 (Bankr. N.D. Ohio 2019), *appeal dismissed sub nom. In re FirstEnergy Sols. Corp.*, No. 20-3322, 2020 WL 6395501 (6th Cir. Nov. 2, 2020).

55. Here, Plan section 4.10.2 provides:

> the entry of the Confirmation Order shall constitute an injunction against all Persons from taking any actions to commence or continue any action or proceeding that arose before the Effective Date against or affecting the Debtor, the Estate or the Assets

56. Because the provision seeks to enjoin not only actions "against . . . the Debtor", but also those "affecting the Debtor, the Estate or the Assets", the injunction is overly broad.

57. Because the Debtor has not shown that the release provision is, on its face, permissible as to any possible claim that could be affected in light of the Debtor's circumstances, its, and the foreseeable claims of the Debtor's creditors, the Injunction does not comply with the Code and is not confirmable under section 1129(a)(1) as currently proposed.

58. Should the Court, despite the foregoing objections, find that the Plan is confirmable, SKAT respectfully requests the Injunction expressly exempt claims against non-debtors.

## V. RESERVATION OF RIGHTS

59. SKAT reserves its rights to supplement this objection based on any additional information supplied by the Debtor or related parties.

## VI. CONCLUSION

60. For the foregoing reasons, SKAT respectfully requests that confirmation of the Plan be denied.

### NOTICE OF HEARING

The above objection shall come on for telephonic hearing before the Honorable Judge Tracey N. Wise, Third Floor Courtroom, United States Bankruptcy Court, 100 East Vine Street, Lexington, Kentucky 40507, at the hour of 9:30 a.m. Eastern on Wednesday, December 2, 2020. Parties wishing to participate in the telephonic hearing shall join approximately 10 minutes prior to the start of the hearing using the following dial-in information: Toll-free: 1- 888-363-4749, Access Code– 6879731#.

BOEHL STOPHER & GRAVES, LLP


*/s/ Scott A. Davidson*
Richard E. Edwards
Scott A. Davidson
400 West Market Street, Suite 2300
Louisville, KY 40202
Phone:  (502) 589-5980
Fax:  (502) 561-9400
redwards@bsg-law.com
sdavidson@bsg-law.com

And

HUGHES HUBBARD & REED LLP

*/s/ Dustin P. Smith*
Dustin P. Smith (admitted pro hac vice)
One Battery Park Plaza
New York, New York 10004-1482
(212) 837-6000 (t)
(212) 422-4726 (f)
Dustin.Smith@hugheshubbard.com

COUNSEL FOR CREDITOR
SKATTEFORVALTNINGEN (CUSTOMS AND TAX
ADMINISTRATION OF THE KINGDOM OF
DENMARK)

**CERTIFICATE OF SERVICE**

In addition to the parties who will be served electronically by the Court's ECF System, the undersigned certifies that a true and accurate copy of the foregoing was served by electronic mail or first-class U.S. mail, postage prepaid, on November 23rd, 2020, on all non-ECF creditors.

*/s/ Scott A. Davidson*
COUNSEL FOR CREDITOR, SKAT